**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CHRISTIAN R. COTIE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **NO. 1:14-CV-07314** |
| **vs.** | ) | |
| | ) | **Magistrate Judge** |
| **CAROLYN W. COLVIN, Acting** | ) | **Michael T. Mason** |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Claimant Christian R. Cotie ("Claimant") brings this motion for summary judgment (Dkt. 9) seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Claimant's request for disability insurance benefits under the Social Security Act, 42 U.S.C. §§ 416(i) and 423(d). The Commissioner has filed a cross-motion for summary judgment (Dkt. 17), asking that this Court affirm the decision of the Administrative Law Judge ("ALJ"). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, Claimant's motion for summary judgment is granted and the Commissioner's cross-motion for summary judgment is denied.

## I. BACKGROUND

### A. Procedural History

On September 21, 2010, Claimant filed his application for benefits alleging he has been disabled since August 5, 2009 due to degenerative disc disease of the lumbar

1

spine and the cervical spine, leg pain, obesity, opiate and alcohol dependence, depression, and anxiety.  (R. 20.)  His application was denied initially in December 2010, and again upon reconsideration in April 2011.  (R. 112-21.)  Claimant appeared with counsel and testified at a hearing before ALJ Janice Bruning on February 14, 2012. (R. 64-84.)  A vocational expert also provided testimony.  On May 18, 2012, the ALJ issued a decision denying Claimant's application.  (R. 87-98.)  Claimant filed a timely request for review of the ALJ's decision with the Appeals Council.  (R. 167.)

On August 2, 2013, the Appeals Council granted Claimant's request for review. (R. 104-08.)  In doing so, the Appeals Council vacated the initial decision and remanded the case back to the ALJ for re-hearing, with instructions to further evaluate Claimant's mental impairments, degenerative disc disease, and obesity, and to clarify the effect of these limitations on Claimant's occupational base.  (*Id.*)  On January 22, 2014, Claimant appeared with counsel for a second hearing before ALJ Bruning.  (R. 35-63.)  Another vocational expert testified at that hearing.  The ALJ issued a second unfavorable decision on March 26, 2014.  (R. 14-28.)  On July 21, 2014, the Appeals Council denied Claimant's request for review.  (R. 1-6.)  At that point, the ALJ's decision became the final decision of the Commissioner.  This action followed and the parties consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).

### B.  Medical Evidence

#### 1. Treating Physicians

Claimant was born on June 25, 1960, making him 49 years old on the onset date of his alleged disability.  Claimant's medical records document a history of chronic pain, including alternating leg pain (worsening since 2001), lower back pain (dating back to

2005), and, more recently, increasing neck pain.  (R. 385, 789.)  Records from 2008 reveal complaints of back pain, which was treated with medication and facet joint injections with some temporary relief.  (R. 389, 396, 407.)  At some point in 2008, Claimant began treatment with Dr. Arpan Patel.  An MRI dated November 26, 2008 showed evidence of low grade 1 spondylolisthesis at L4-5 and moderate to significant disc degeneration at L1-2.  (R. 388.)  In 2008 and early 2009, Dr. Patel performed several procedures on Claimant in an attempt to diagnose and relieve his lower back pain.  Among these were a failed spinal cord stimulator trial, a radiofrequency ablation, and multiple epidural steroid injections.  (R. 398.)

On March 17, 2009, Claimant had an initial consultation with neurosurgeon, Dr. Sean Salehi.  (R. 385-88.)  In addition to lower back pain, Claimant told Dr. Salehi that he was also suffering from alternating leg pain (left worse than right), muscle weakness, stiffness, sciatica, and paresthesias.  (R. 385-86.)  He rated his pain as an eight on a ten-point scale.  (R. 385.)  At the time, he was taking Vicoprofen, Oxycontin, and Lyrica, which helped alleviate his pain.  (*Id.*)  Claimant told Dr. Salehi that he was no longer active, had gained 35 pounds in the previous six months, and that he was experiencing some depression due to his worsening pain.  (*Id.*)  Claimant also reported a 1977 motor vehicle accident, which resulted in a left ankle fracture and subsequent surgery.  (*Id.*)  At the time of the consultation, Claimant was still working and occasionally lifted up to 100 pounds.  (R. 386.)  He admitted to drinking at work after previously being sober for twenty three years.  (*Id.*)  Claimant also admitted to drinking alcohol on the day of his consultation to "numb the pain."  (*Id.*)  He had smoked one and a half packs of cigarettes per day for the past thirty years.  (*Id.*)

3

After conducting a physical exam and reviewing recent MRIs, Dr. Salehi assessed lumbar degenerative disc disease and grade 1 spondylolisthesis. (R. 388.) Because Claimant was reluctant to undergo physical therapy and had showed little success with injections, Dr. Salehi recommended he obtain a discogram with Dr. Patel to confirm the true levels causing concordant pain. (*Id.*) If appropriate, Dr. Salehi further recommended a transforaminal lumbar interbody fusion surgery. (*Id.*) Dr. Patel performed the discography in April 2009 to better determine the source of his pain. (R. 398-400.)

In May 2009, Claimant continued to complain of pain at an appointment with Dr. Patel. (R. 411.) He was frustrated, smelled of alcohol, and had recently been taking high amounts of opioids. (*Id.*) Dr. Patel counseled Claimant about the danger of misusing opioid medication. (*Id.*) Dr. Patel also recommended Claimant follow-up with Dr. Salehi because he believed he had tried all interventions he believed would be beneficial. (*Id.*) The next day, following the results of a drug screen, Dr. Patel discharged Claimant from his care for not being transparent about his use of medication. (R. 412.)

Claimant continued treatment with Dr. Salehi and, on August 24, 2009, underwent a L4-S1 transforaminal lumbar interbody fusion surgery for his history of low back and bilateral leg pain. (R. 458-60.) His hospital stay for the surgery was described as "complicated" in light of his history of abuse of pain medications. (R. 454.) Prior to surgery, Claimant had been taking high doses of Oxycontin, Dilaudid, and Ultram, but he tapered his dosages one week before surgery. (*Id.*) During his hospital admission, he refused pain consultation, but was given lower doses of Oxycontin, as

well as low doses of Soma and Norco.  (*Id.*)  He was also evaluated for depression.  (R. 456.)  The examining psych physician noted an ongoing struggle with alcohol abuse and opiate dependence.  (*Id.*)  Claimant's mood was dysphoric, and his affect downcast.  (*Id.*)  He also expressed criticism of doctors and accused doctors of lying to him.  (*Id.*)  His insight and judgment were noted as poor.  (*Id.*)  The doctor assessed a mood disorder, secondary to opiate dependence, and chronic pain syndrome.  (*Id.*)  Claimant rejected the recommendation for antidepressants and therapy, but agreed to a low dose of Ativan to help reduce irritability.  (*Id.*)  Ultimately, Claimant was discharged following his surgery and advised to follow-up with Dr. Salehi in two weeks.  (*Id.*)

Claimant did as directed and saw Dr. Salehi on September 4, 2009.  (R. 554.)  Overall he was "doing pretty well," though he had noticed neck and shoulder pain since the surgery.  (*Id.*)  Both Claimant and Dr. Salehi were optimistic about the results of the surgery.  (*Id.*)  He was advised to discontinue Oxycontin and cut down on his Norco pills.  (R. 556.)  Dr. Salehi also recommended physical therapy two to three times a week for four to six weeks.  (*Id.*)

On September 9, 2009, Claimant was admitted to MacNeal Hospital after telling his primary care physician, Dr. Michael Gershberg, that he had been experiencing shortness of breath for the past two to three days.  (R. 422, 654.)  Claimant believed that his decreased dosage of pain medications was likely the cause.  (R. 422.)  Examinations and imaging ruled out a pulmonary embolism or any cardiac related problems.  (R. 425.)  Instead, it was determined by multiple physicians that Claimant was suffering from opiate withdrawal.  (R. 425, 428, 430.)  Claimant was not interested

in starting methadone treatment and was eventually discharged with low doses of Norco and Soma.  (R. 422.)

Claimant returned to see Dr. Gershberg on September 17, 2009, at which point he reported his back pain had improved.  (R. 666.)  A physical exam was normal and Dr. Gershberg planned to start weaning him off his pain medication.  (R. 667.)   But the next month, Claimant complained that he needed to take more Norco than was prescribed.  (R. 669.)  Dr. Gershberg recommended a referral to a pain management specialist.  (R. 670.)  The next week, a pain specialist told Claimant that he would not prescribe narcotic-containing medication given previous misuse of such medication.  (R. 672.)

Claimant followed up with Dr. Salehi again on November 6, 2009, about two and a half months following surgery.  (R. 543.)  By that point, his leg pain had disappeared and he was able to walk on a treadmill for ten minutes without pain.  (*Id.*)  He was still experiencing some right sided low back pain, worse at night.  (*Id.*)  He said that if he was particularly active during the day, he would "pay the price" the next day.  (*Id.*)  He admitted to sometimes taking more than the recommended six tabs of Norco a day. (*Id.*)   A physical exam was essentially normal.  (R. 544-45.)  Dr. Salehi was pleased with Claimant's progress, although it was moving slowly.  (R. 545.)  He recommended an additional four weeks of physical therapy and opined that Claimant would be able to return to work at six months post-op with desk work/light duty restrictions.  (*Id.*)

The next month, Claimant had finished his physical therapy.  (R. 675.)  He still reported constant back pain to Dr. Salehi, but was noticing minuscule improvement every week.  (*Id.*)  He had not been using the bone stimulator.  (*Id.*)  Dr. Salehi

recommended he stay off work until March. (R. 677.) By March 16, 2010, Claimant was feeling only minimally better than he was in December, but admitted he was at least 40-50% improved since the surgery. (R. 546.) He complained of constant pain in his lower back and a "pulling of [his] sciatica" in both legs. (*Id.*) He also suffered from intermittent numbness in his left foot. (*Id.*) Acupuncture had helped and he was wearing a bone stimulator daily. (*Id.*) He admitted to sometimes taking more than eight Norco tabs a day. (*Id.*) Claimant exhibited tenderness throughout the lumbar spine. (R. 547.) A recent x-ray revealed no evidence of instrumentation failure. (R. 548.) Dr. Salehi concluded that Claimant could gradually increase his level of activity and return to work at full duty without restrictions. (*Id.*) He referred Claimant to a pain management clinic because treatment of chronic pain fell beyond his expertise. (*Id.*)

Claimant first visited Dr. Koehn for pain management on March 27, 2010. (R. 564.) He described his history of persistent back and leg pain, and complained of difficulty sleeping due to his pain. (*Id.*) Dr. Koehn assessed chronic pain syndrome, among other things, and planned to try different courses of medication to treat Claimant's pain and improve sleep quality. (R. 565.)

Claimant continued to see Dr. Koehn on a monthly basis until early 2011. (R. 565-605.) Over the course of his treatment, Dr. Koehn prescribed several different pain medications, all with varying success. (*Id.*) For example, on April 16, 2010, Claimant reported he had restarted exercising and his sleep had improved. (R. 567.) But by the following month, his pain had worsened and his physical activity had decreased. (R. 567.) Despite improvement in June 2010, Claimant was suffering an "arrest of

progress" in July 2010.  (R. 573.)  At that point, Dr. Koehn recommended steroid injections, which were administered on two separate occasions.  (R. 575-78.)

On August 28, 2010, Dr. Koehn noted short-term improvement and Claimant had been able to organize his garage and ride his bicycle.  (R. 579.)  But the next month, Dr. Koehn commented that, on a long-term basis, Claimant's "pain functional state has not changed."  (R. 581.)  He also raised concerns regarding Claimant's overuse of pain medications.  (*Id.*)  He referred Claimant for a psychological evaluation.  (*Id.*)  On November 5, 2010, Claimant told Dr. Koehn that he was sleeping better, keeping busy with projects around the house, and felt "ready to get up in the morning and do things." (R. 583.)  A few weeks later, Dr. Gershberg counseled Claimant about his concerns regarding long-term narcotic dependence and misuse, but recommended against further surgery or injections.  (R. 703.)

Claimant returned to see Dr. Salehi for follow-up on November 26, 2010.  (R. 537.)  Claimant reported that his pain level remained unchanged and that he experienced "sciatic" pain with prolonged activity.  (*Id.*)  He had not yet returned to work. (*Id.*)  A recent x-ray showed no evidence of instrumentation failure.  (R. 539.)  Dr. Salehi planned to obtain a spine CT to confirm there were no additional problems.  (*Id.*)  A CT from December 4, 2010 again revealed no evidence of instrumentation failure and a solid interbody fusion.  (R. 542.)  Dr. Salehi stressed to Claimant the importance of staying physically active, tapering off of narcotics, and weight loss.  (*Id.*)

Claimant visited Dr. Koehn once more on January 7, 2011.  (R. 614.)  During that visit, Dr. Koehn noted that Claimant continued to struggle with pain.  (*Id.*)  Claimant told

Dr. Koehn that he was dissatisfied with his "pain functional state" and both parties agreed that Claimant would seek an alternative opinion for his pain management.  (*Id.*)

Claimant continued to see his primary care physician Dr. Gershberg on a monthly basis throughout 2011 for medication management.  (R. 712-30.)  His pain symptoms waxed and waned in intensity, though physical exams were mostly unremarkable.  (*Id.*)  He continued taking Oxycontin and Norco, as well as Lyrica, and also underwent injections.  (*Id.*)  In March 2011, at Claimant's request, Dr. Gershberg obtained a second opinion about his treatment from Dr. Harel Deutsch.  (R. 721-22.)  Following a physical exam, Dr. Deutsch confirmed that the recent CT scan showed a good lumbar fusion and stated that Claimant would not benefit from any further surgery.  (R. 722.)  He did believe Claimant would be limited in his ability to lift given his lumbar fusion.  (*Id.*)

In June 2011, Claimant was feeling "a bit depressed" and struggling with the "long term nature of his disability."  (R. 728.)  Lyrica was not helping.  (*Id.*)  Claimant had a "flare up" in August after trying to do more chores around the house.  (R. 761.)  Dr. Gershberg commented that an attempted detox earlier in the year was unsuccessful because severe pain returned following one week of medication discontinuation.  (*Id.*)  Dr. Gershberg also completed a "Multiple Impairment Questionnaire."  (R. 732-39.)  He said he had been treating Claimant on a monthly basis since 2007 for chronic pain, opiate dependence, and depression.  (R. 732.)  The prognosis was fair and Dr. Gershberg's assessment was evidenced by limited range of motion, limited tolerance to activities, poor concentration, and reduced level of alertness.  (*Id.*)  According to Dr. Gershberg, Claimant's chronic pain would limit him to sitting and standing for less than

an hour in an eight-hour day, and occasionally lifting and carrying ten to twenty pounds. (R. 734-35.)  In Dr. Gershberg's opinion, Claimant would be incapable of working even a low stress job in light of his depression, dependence on narcotics, and failed attempts at detox.  (R. 737.)  Claimant would also likely be absent from work more than three times a month.  (R. 738.)

Throughout the remainder of 2011, Claimant continued to complain to Dr. Gershberg of waxing and waning pain.  (R. 754-760.)  Dr. Gershberg attempted different medication regimens.  (*Id.*)  In a letter dated March 2012, Dr. Gershberg described Claimant's history of depression, chronic pain, and his failed treatment.  (R. 771.)  He said that Claimant had been unable to discontinue his medications, but had not been misusing them.  (*Id.*)  Dr. Gershberg again stated his belief that Claimant would be unemployable.  (*Id.*)

Imaging taken in June 2012 -- following more complaints of pain -- showed mild multilevel degenerative disc disease of the cervical spine and thoracic spine.  (R. 774-75, 813.)  Claimant returned to see Dr. Deutsch in August 2012.  He complained of two months of increasing neck pain and upper extremity problems, as well as numbness. (R. 789.)  He reported he simply had never improved after his surgery.  (*Id.*)  A physical exam was primarily unremarkable.  (R. 790-91.)  Dr. Deutsch diagnosed cervical spondylosis.  (R. 791.)  He noted that the pain described by Claimant was severe and interfered with day-to-day activities. (*Id.*)  Dr. Deutsch discussed surgery with Claimant, but recommended that more conservative options would be the best course of action. (*Id.*)

Claimant continued to see Dr. Gershberg during the remainder of 2012 and throughout 2013. (R. 874-909.) He reported difficulty engaging in sustained activity, fluctuating levels of pain, and he continued using medication for treatment. (*Id.*) At times, he was depressed, and in May 2013 he reported he was drinking a pint of vodka a day. (R. 893, 902.) He was advised to seek treatment, and he reported he remained mostly sober over the next few months. (R. 874-889.)

Dr. Gershberg completed another Multiple Impairment Questionnaire in February 2014. (R. 962.) Citing the same history of chronic pain and depression, as well as episodic alcohol abuse, Dr. Gershberg opined this time that Claimant could sit for two hours, stand for less than one, and could never lift or carry ten to twenty pounds. (R. 964-65.) He also concluded Claimant would have moderate to marked limitations in grasping, using his fingers, and reaching. (R. 965-66.) In a separate form, Dr. Gershberg stated that Claimant was disabled without consideration of any drug abuse or alcohol use because his use of drugs and alcohol were a form of self-medication. (R. 970.)

### 2. Agency Physicians

The medical evidence also includes two assessments of Claimant's physical residual functional capacity ("RFC") prepared by Agency medical consultants. Dr. Virgilio Pilapil performed the first assessment on December 8, 2010. (R. 606-613.) Upon review of Claimant's medical records, Dr. Pilapil concluded that Claimant could occasionally lift up to twenty pounds, and could frequently lift up to ten pounds; could stand and/or walk for six hours in an eight-hour day; could sit for six hours in an eight-hour day; and had no limitations in pushing or pulling. (R. 607.) Dr. Pilapil also

concluded that Claimant should only occasionally climb ramps, stairs, ladders, ropes, or scaffolds. (R. 608.) Dr. Pilapil found no other postural, manipulative, visual, communicative, or environmental limitations. (R. 608-10.) Dr. Pilapil based his assessment on Claimant's history of chronic back pain, treatment with medication and injections, and Dr. Koehn's treatment notes from August 2010. (R. 611.)

Dr. Vidya Madala conducted a second RFC assessment on March 30, 2011. (R. 618-625.) Dr. Madala indicated that Claimant had not undergone any significant medical changes since Dr. Pilapil's previous assessment. (R. 625.) Dr. Madala made only slight modifications to Dr. Pilapil's findings. With respect to Claimant's postural limitations, Dr. Madala indicated that Claimant could frequently climb ramps or stairs, kneel or crawl, and could only occasionally stoop or crouch. (R. 620.) In support of his assessment, Dr. Madala cited to the November/December 2010 records from Dr. Salehi. (R. 625.)

### C. Testimony from the February 14, 2012 Hearing

#### 1. Claimant's Testimony

Claimant testified before the ALJ on February 14, 2012. At the time of that hearing, he was 52 years old, 5'11" tall, and weighed 240 pounds. (R. 67.) Claimant testified that he was married and lived in a duplex with his wife and daughter. (R. 67-68.) He completed college and received a degree in music management. (R. 67.) Claimant stated that he had not worked since August 5, 2009. (R. 68.) Previously, Claimant worked for a print shop, where he prepared, printed, and cut paper. (R. 69.) He regularly lifted over 100 pounds in that position. (*Id.*)

Claimant explained that he suffers from an aching pain in his lower back, hips, legs, knees, and ankles.  (R. 69.)  He testified that he had been taking pain medication to help with his back pain for five to seven years.  (R. 77.)  He described the side effects of these medications as "spaciness" and memory loss.  (R. 70.)  He also stated that he was less articulate than he had previously been.  (*Id.*)  Claimant testified that he was aware of the risks of addiction to these medications, and that several doctors had attempted to wean him off of them.  (R. 77-78.)  He continued taking these medications, however, because he still needed them to manage his pain.  (R. 78.)  Claimant also testified that he had not experienced significant pain relief following his surgery.  (R. 76.)

Claimant testified that he can walk from his house to his car and from his car to a store "on a good day."  (R. 71.)  He drives a couple of times a week around the neighborhood or to the store.  (R. 73.)  He can stand for thirty minutes to an hour, after which he needs to lay down and recover, and he can sit up to an hour at a time.  (R. 71.)  He climbs the flight of stairs in his house about ten times a day because the bathroom is upstairs and he doesn't have a choice.  (R. 72.)  He can lift a gallon of milk as long as he does so correctly, but has difficulty bending, stooping, crouching, crawling, kneeling, and reaching.  (*Id.*)  He used to play the guitar, but stopped when he had difficulty sitting still to practice.  (R. 73, 76.)  He also recently developed a tremor, which he had not discussed with his doctors.  (R. 73.)  He testified he can prepare basic meals for himself, do laundry, and do housework such as vacuuming, but only "with enough medication."  (R. 73-74.)  Similarly, Claimant testified that he was able to remove snow in the winter, but only after taking a heavy dose of pain medication.  (R.

75-76.)  Claimant also stated that he was unable to sleep through the night without being awoken by pain.  (R. 73.)

In addition to his physical pain, Claimant testified that he suffers from depression and anxiety.  (R. 70, 79.)  He has taken medications for these problems, but at times stopped taking them because he was "never happy or sad," just "stuck in the middle." (R. 70.)  He had recently begun taking his medication again due to increased anxiety. (*Id.*)  He experienced anxiety "more days than not," and at times he felt like he wanted to die.  (R. 70, 79.)  Claimant stated that he went to the hospital a year prior to the hearing because he couldn't breathe, and that the emergency room doctors told him he may have suffered a panic attack.  (R. 71.)

### 2.  Vocational Expert's Testimony

Vocational Expert ("VE") Thomas Gusloff also testified at Claimant's February 2012 hearing.  The VE first described Claimant's past work as a printer under the Dictionary of Occupational Titles ("DOT").  (R. 81.)  The VE explained that a printer is defined as skilled and medium under the DOT, but that Claimant performed the position at the heavy level.  (*Id.*)  The VE testified that there were no transferable skills from Claimant's previous work to sedentary or light positions.  (*Id.*)

The ALJ then asked the VE to consider a hypothetical individual of the Claimant's age, education and experience, who can lift and carry twenty pounds occasionally, ten pounds frequently; can stand and/or walk a total of six hours during an eight-hour work day; can sit at least six hours during an eight-hour work day; can never climb ladders, ropes or scaffolding; can occasionally climb ramps and stairs; and can occasionally balance, stoop, crouch, kneel and crawl.  (R. 82.)  The ALJ then asked whether there

were any jobs such an individual could perform.  (*Id.*)  The VE stated that such an individual could work in the light, unskilled positions of photocopying machine operator, insert machine operator, or folding machine operator.  (*Id.*)

 Next, the ALJ adjusted the hypothetical to an individual who can lift ten pounds occasionally, and less than ten pounds frequently; can stand and or walk a total of two hours in an eight hour day, sit for at least six hours; can never climb ladders, ropes, or scaffolding; can occasionally climb ramps and stairs, balance, stoop, crouch kneel and crawl; and would require a sit/stand option that would allow him to stand for one to two minutes after sitting for an hour.  (R. 82.)  The VE testified that such an individual could work in the sedentary, unskilled positions of document preparer, plates preparer, or telephone information clerk.  (R. 82-83.)  These positions would allow an individual to use an assistive device if needed.  (R. 83.)  But, an individual who was off task 20% of the day, for any reason, or was unable to complete an eight hour work-day on a regular basis would be unable to maintain competitive employment.  (*Id.*)

On cross-examination, Claimant's attorney asked the VE whether a person who had to miss three unscheduled days of work per month would be able maintain competitive employment.  (R. 84.)  The VE responded that such an individual would not be employable.  (*Id.*)

### D.  Testimony from the January 22, 2014 Hearing

#### 1.  Claimant's Testimony

After his case was remanded by the Appeals Council, Claimant testified at a second hearing before ALJ Bruning.  Claimant still lived with his wife and one of his daughters.  (R. 39.)  Claimant described the back pain he continued to experience since

his first hearing.  (R. 39.)  Claimant testified that his back pain had worsened over time, and characterized his condition as a "downward spiral."  (R. 58.)  Claimant also testified about the pain in other parts of his body.  He explained that he had broken his ankle many years ago, and had suffered various other leg injuries throughout his life.  (R. 40.)  His leg and ankle pain has been exacerbated by the problems with his back, making it difficult to walk or stand on his feet for any amount of time.  (*Id.*)  Claimant testified that he can walk a half a mile, but with difficulty, stand for thirty minutes, and sit for thirty minutes at a time before needing to stand up.  (R. 43.)  He does not use an assistive device, but leans on walls and railings.  (R. 45.)  He climbs the stairs in his house because he has to.  (*Id.*)  Claimant did not believe he could lift a gallon of milk.  (R. 44.)  He has difficulty bending, stooping, crouching, and crawling.  (R. 45.)  Overall, Claimant explained that his ability to sit, stand, walk and lift have worsened over the last few years.  (R. 58.)

Claimant also explained that he had suffered from neck pain for the last 20 years, but that the pain had grown more intense in the past 18 months.  (R. 53-54.)  He recently underwent an MRI of his cervical spine with Dr. Deutsch, who diagnosed him with stenosis.  (R. 55.)  Claimant also claimed that Dr. Deutsch told him he was "screwed," and that further surgery would not be beneficial to him.  (*Id.*)

Claimant testified that he currently only leaves the house a couple times a week, and stopped driving over a year ago.  (R. 47, 56.)  He can do more activities on "good days," but has around twenty bad days per month when his pain is substantially worse.  (R. 57.)  On a bad day, he lies on the couch and watches television.  (*Id.*)  Claimant can make himself simple meals and can vacuum on a good day.  (R. 47-48.)  It takes him

four hours to do the dishes and he does laundry over the course of a few days.  (R. 43, 47.)  Showering and getting dressed have become more difficult, and he has only been showering about once per week.  (R. 58.)  Claimant had not been able to ride his bike recently.  (R. 52.)  He sleeps about five hours a night and takes two to three naps a day.  (R. 40, 46.)  He recently started using an inhaler before he goes to bed.  (R. 40.)  He was still smoking at the time of the hearing, but testified he was trying to quit.  (*Id.*)

Claimant was taking 160 milligrams of Oxycontin and six Norco pills per day, as well as muscle relaxers.  (R. 41.)  Claimant detailed side effects from the medications, including difficulty thinking, concentrating, and focusing, as well as short term memory loss.  (*Id.*)  He no longer enjoys any hobbies because he cannot focus.  (*Id.*)  Claimant experiences depression and low self-esteem and he testified to crying spells and panic attacks.  (R. 40-42.)  He has been taking Clonazepam for those problems.  (*Id.*)

When asked if he had a problem with alcohol, Claimant stated that he had been sober for 25 years, but over the past few years had started drinking again on and off.  (R. 42-43.)  Claimant admitted that he had consumed alcohol on the morning of his hearing.  (R. 43.)

### 2.  Vocational Expert's Testimony

VE Glee Ann Kehr testified at Claimant's second hearing before the ALJ.  The VE classified Claimant's past work as a "press operator, printing press work," which is medium and skilled under the DOT, but which was performed at the heavy level by Claimant.  (R. 59.)  The VE explained there were no transferable skills below the medium level.  (*Id.*)

Next, the ALJ asked the VE to consider a hypothetical individual of Claimant's age, education, and work experience, who can lift and carry twenty pounds occasionally, and ten pounds frequently; can stand and walk for six hours during an eight-hour day; can sit at least six hours in an eight-day; can never climb ladders, ropes or scaffolding; and can only occasionally climb ramps, stairs, balance, stoop, crouch, kneel, and crawl. (R. 59.) The ALJ then asked the VE whether there were jobs such an individual could perform. (*Id.*) The VE testified that the individual could perform work in the light, unskilled positions of housekeeper, mail room clerk, or information clerk. (R. 59-60.) The individual could perform these positions if he also needed a sit/stand option and if he were restricted to three to four-step simple, repeated, routine tasks. (R. 60.)

The ALJ changed his hypothetical to an individual who can lift and carry ten pounds occasionally, and less than ten pounds frequently; can stand and walk for two hours in an eight-hour day, and sit for six; can never climb ladders, ropes, or scaffolding; and can occasionally climb ramps and stairs, balance, stoop, crouch, kneel, and crawl. (R. 60.) The individual would require a sit/stand option allowing him to stand for one to two minutes after forty-five minutes of sitting, and would be limited to three to four-step simple, repeated, routine tasks. (*Id.*) The VE testified that such an individual could perform work in the sedentary, unskilled positions of address clerk, order clerk, and telephone clerk. (R. 60-61.) The individual would only be permitted to be off task 15% of the workday and would be allowed no more than one absence a month. (R. 61.)

On cross-examination, Claimant's attorney asked the VE to consider an individual who can lift and carry twenty pounds occasionally, but who can sit, stand and

walk for less than two hours of an eight-hour workday.  (R. 62.)  The VE testified that such an individual would be precluded from all full-time, competitive work.  (*Id.*)

## II. <u>LEGAL ANALYSIS</u>

### A. Standard of Review

We must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).  Substantial evidence is more than a scintilla of evidence and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971).  We must consider the entire administrative record, but we will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner."  *Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir.2003) (quoting *Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir.2000).  We will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." (*Id.*)  The ALJ "must build an accurate and logical bridge from the evidence to [his] conclusion," but need not discuss every piece of evidence in the record. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001).  The ALJ must "sufficiently articulate [his] assessment of the evidence to 'assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning.'"  *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir.1993) (per curiam) (quoting *Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir. 1985).

### B. Analysis Under the Social Security Act

To qualify for disability insurance benefits, a Claimant must be "disabled" under the Social Security Act (the "Act"). A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a Claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the Claimant is currently employed, (2) whether the Claimant has a severe impairment, (3) whether the Claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the Claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the Claimant is capable of performing any work in the national economy." *Dixon,* 270 F.3d at 1176. The Claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001). If the Claimant reaches step five, the burden then shifts to the Commissioner to show that "the Claimant is capable of performing work in the national economy." *Id.* at 886.

The ALJ applied this five-step analysis in her second opinion denying benefits. At step one, the ALJ found that Claimant was not currently engaged in substantial gainful activity and had not been engaged in substantial gainful activity during the period from his alleged onset date of August 9, 2009, through his date last insured of December 31, 2014. (R. 19.) At step two, the ALJ found that Claimant has the following severe impairments: obesity, degenerative disc disease of the lumbar spine, degenerative disc disease of the cervical spine, history of opiate dependence and

alcohol use, depression, and anxiety. (R. 19-20.) At step three, the ALJ found that Claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 20-22) The ALJ then assessed Claimant's RFC, finding that Claimant has the RFC to perform light work as defined in 20 C.F.R. 404.1567(b), except that the Claimant should never climb ladders, ropes or scaffolds and should no more than occasionally climb ramps/stairs, balance, kneel, stoop, crouch, and crawl. (R. 23.) The ALJ further stated that Claimant should be limited to 3-4 step simple, routine, and repetitive tasks. (*Id.*) At step four, the ALJ found that Claimant is unable to perform any of his past relevant work. (R. 27.) But, at step five, the ALJ found that considering Claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Claimant can perform. (R. 27-28.) As a result, the ALJ concluded that Claimant has not been under a disability, as defined in the Act, from August 5, 2009 though the date of her decision. (R. 28.)

Claimant now argues that the ALJ's decision must be remanded because her second and third step findings were not supported by substantial evidence, and because, for a slew of reasons, she failed to properly assess Claimant's physical and mental RFC.

### C. The ALJ's Second and Third Step Findings do not Require Remand.

Claimant first argues that the ALJ erred in her second step finding because she did not include Claimant's chronic pain syndrome, lumbar radiculopathy, or left ankle impairment among his severe impairments at step two. The Court finds no independent reversible error at step two.

Again, at step two, the ALJ is tasked with determining whether a claimant suffers from a severe impairment. An impairment is severe if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); *see also*, Social Security Ruling ("SSR") 96-3P (S.S.A.), 1996 WL 374181 (July 2, 1996). In deciding whether an impairment is severe, "courts have considered whether the claimant received a 'definite diagnosis,' whether treatment was recommended, and whether medication remedied or controlled the impairment." *Colson v. Colvin*, 120 F. Supp. 3d 778, 788 (N.D. Ill. 2015) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)). In any event, the ALJ's inquiry at step two has been described as a "*de minimis* screening for groundless claims." *Thomas v. Colvin*, 826 F.3d 953, 960 (7th Cir. 2016) (citing *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d. Cir. 2003)).

In support of his argument, Claimant cites to evidence in the record documenting his chronic pain syndrome, lumbar radiculopathy, and left ankle injury. Claimant is certainly correct that the record includes some evidence of these problems. But, because the ALJ found Claimant to be suffering from other severe impairments at step two, we need not dwell on the ALJ's decision to omit these three additional impairments as severe. *See Raines v. Astrue*, No. 06 C 0472, 2007 WL 1455890, at *7 (S.D. Ind. April 23, 2007) ("As long as the ALJ proceeds beyond step two, as in this case, no error could result solely from his failure to label an impairment as 'severe.' "). Instead, we must focus on whether the ALJ properly considered the cumulative effect of all of Claimant's impairments, whether severe or not, in subsequent steps of the analysis. *See Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *6 (N.D.Ill. Feb. 2, 2012)

(citing *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003)).  We address that issue in Part D below.

Next, Claimant argues, in a very cursory manner, that the ALJ's purported error at step two caused her to also err at step three.  Because Claimant has failed to develop this argument in any meaningful manner, it is rejected.  *United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003) (warning that perfunctory and undeveloped arguments are waived).  As such, there is no independent basis for remand at step three.

### D.  The ALJ's Assessment of Claimant's RFC was Flawed and Remand is Required.

Turning to the subsequent steps of the analysis, Claimant also raises a number of issues with the ALJ's assessment of his RFC.  According to Claimant, the ALJ failed to properly articulate her RFC assessment, failed to properly assess his credibility, and improperly rejected the opinions of his treating physicians.  On the whole, the Court agrees that the ALJ's RFC determination was not supported by substantial evidence and requires remand.

The RFC is the most a claimant can still do despite his limitations.  20 C.F.R. §§ 404.1545(a).  In making the RFC determination, the ALJ will consider all of the relevant medical and other evidence in the record, including evidence of impairments that are not severe.  *Id*; *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008).  The RFC assessment must contain a narrative discussion describing how the evidence supports the ALJ's conclusions and explaining why any medical source opinion was not adopted if the ALJ's RFC assessment conflicts with such an opinion.  SSR 96-8p, 1996 WL 374184, at **5, 7; *accord Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).  A

court will uphold an ALJ's decision "if the evidence supports the decision and the ALJ explains his analysis of the evidence with enough detail and clarity to permit meaningful review." *Arnett v. Astrue*, 676 F.3d 586, 591-92 (7th Cir. 2012) (citing *Eichstadt v. Astrue*, 534 F.3d 663, 665-66 (7th Cir. 2008)).

Here, like the Claimant, the Court sees an evidentiary deficit in the ALJ's RFC assessment. Again, the ALJ ultimately concluded that Claimant could perform light work, with some additional postural and mental limitations. But it is clear to the Court that in reaching that conclusion, the ALJ improperly cherry-picked evidence that would support her conclusion, while ignoring the evidence that would not. *See Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding."). For example, the ALJ hones in on 2010 post-surgery records that show progress and symptom improvement. But, as outlined above, interspersed between those records and in subsequent records are an equal number of records that reveal that Claimant continued to complain of waxing and waning chronic pain and fluctuating levels of activity. The ALJ chose to ignore those records and Claimant's obviously worsening symptoms. Further, although the ALJ noted that Claimant was released to work in 2010 by Dr. Salehi, she ignores the fact that Claimant never did return to work and that his doctors continued to prescribe heavy medications and perform injections for his chronic pain after that point.

Further, in cases such as this one where chronic complaints of somewhat unexplained pain are at issue, it is important for the ALJ to properly assess a claimant's

complaints of pain.  At the outset, we note that the Social Security Administration (the "SSA") has recently updated its guidance about evaluating symptoms in disability claims.  *See* SSR 16-3p, 2016 WL 1119029 (March 16, 2016).  The new ruling eliminates the term "credibility" from the Administration's sub-regulatory policies to "clarify that subjective symptom evaluation is not an examination of the individual's character."  *Id.* at *1.  Though SSR 16-3p post-dates the ALJ's hearing in this case, the application of a new social security regulation to matters on appeal is appropriate where the new regulation is a clarification of, rather than a change to, existing law.  *Pope v. Shalala*, 998 F.2d 473, 482-483 (7th Cir. 1993), overruled on other grounds by Johnson v. Apfel, 189 F.3d 561 (7th Cir. 1999).

As before, under SSR 16-3p, the ALJ must carefully consider the entire case record and evaluate the "intensity and persistence of an individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities."  SSR 16-3p, 2016 WL 1119029 at *2.  In making a credibility determination, the ALJ "may not disregard subjective complaints merely because they are not fully supported by objective medical evidence."  *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995).  Rather, SSR 16-3p requires the ALJ to consider the following factors in addition to the objective medical evidence: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the pain or other symptoms; (3) factors that precipitate and aggravate the symptoms, (4) the type, dosage, effectiveness and side effects of medication; (5) any treatment, other than medication, for relief of pain or other symptoms; (6) any measures the claimant uses to relieve the pain or other

symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. SSR 16-3p, 2016 WL 1119029 at *7.

Here, the ALJ found Claimant's complaints to be "not entirely credible," but her reasons for doing so are flawed. Not only did the ALJ cherry-pick evidence, as discussed above, but she appeared to place a great deal of reliance on Claimant's reported daily activities from a post-surgery period in 2010. In no fewer than four portions of her opinion, the ALJ cited to Claimant's ability to walk up to one mile, exercise, plant, mow the lawn, ride a bicycle, and refinish furniture. But the records reflecting those activities are but a snapshot of Claimant's functional abilities. He later described severely limited daily activities, which were performed while heavily medicated and which took much longer than they should. At his second hearing, he even testified to only showering once a week due to his pain. The ALJ clearly failed to consider the full extent of claimant's daily activities or take into consideration how those activities were performed. *See Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008) (noting that an ALJ should not ignore *how* a claimant carries out daily activities or place undue weight on those activities when assessing a claimant's ability to hold a job outside the home).

The ALJ also relies on Claimant's treatment history as a reason to undermine his allegations, but again, there is no dispute that along with very heavy medication, he has undergone various diagnostic procedures and surgery, engaged in physical therapy, and received injections, even following his surgery. Further, although the medical records include numerous references to potentially drug-seeking behavior, apart from

identifying opiate abuse as a severe impairment, in this most recent opinion, the ALJ did not specifically cite to such behavior as a reason for undermining Claimant's credibility.

As for the ALJ's consideration of the opinion evidence in the record, she essentially rejected all of the opinions of Claimant's treating physicians, and gave "some weight" to the 2010 and 2011 opinions of the Agency consultants. Even if we accept that the ALJ gave "good reasons" for rejecting his doctors' opinions, *Martinez v. Astrue,* 630 F.3d 693, 698 (7th Cir. 2011), after doing so the ALJ was left to rely on the opinions of the agency consultants from three years prior to her decision. Those consultants, through no fault of their own, obviously did not consider the plethora of records post-dating those opinions. On this record, the Court is concerned that the ALJ's reliance on those somewhat outdated opinions was misplaced.

For all of these reasons, remand is appropriate for the ALJ to reconsider the Claimant's RFC, his symptoms, and the opinion evidence.

## III.    CONCLUSION

For the reasons set forth above, Claimant's motion for summary judgment is granted and the Commissioner's cross-motion for summary judgment is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion. It is so ordered.

_____
**Michael T. Mason**
**United States Magistrate Judge**


**Dated: September 28, 2016**